## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NESTLÉ USA, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _2:2_1-cv-2225 |
| | ) |
| **GREAT WESTERN MANUFACTURING** | ) |
| **CO., INC.**, a Kansas corporation, | ) |
| 2017 South 4th Street | ) DEMAND FOR JURY TRIAL |
| Leavenworth, KS 66048 | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff Nestlé USA, Inc. ("Nestlé") hereby alleges:

1.       This action arises out of an unreasonably dangerous industrial flour sifter sold to Nestlé by the manufacturer, defendant Great Western Manufacturing Co., Inc. ("Great Western"). Nestlé used the sifter in a factory in Danville, Virginia (the "Danville Factory"), which manufactures Nestlé Toll House ready-to-bake refrigerated cookie dough products.

2.       In the fall of 2019, several consumers reported finding rubber pieces in certain cookie dough products produced in July and August 2019.  After identifying an industrial hose within the sifter as the source of the rubber contamination, Nestlé recalled nationwide over two million cases of cookie dough products.  Nestlé files this action to recover its damages.

## THE PARTIES

3.       Nestlé is a U.S. affiliate of the world's largest food and beverage company.  Nestlé is a Delaware corporation with its principal place of business in Arlington, Virginia.

4.      Great Western is a Kansas corporation with its principal place of business in Leavenworth, Kansas.  Great Western designs, manufactures, and sells industrial sifters.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. section 1332(a)(1). Nestlé and Great Western are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      The Court has personal jurisdiction over Great Western.  Venue is proper in this District under 28 U.S.C. section 1391(b).  Great Western is incorporated and has its headquarters in Leavenworth, Kansas.  Great Western also designed, manufactured, sold, and shipped the sifter at issue in this action in and from Kansas.

## FACTUAL ALLEGATIONS

### A.      Nestlé Manufactures Cookie Dough Products

7.      The Danville Factory manufactures, among other products, Nestlé Toll House ready-to-bake refrigerated cookie dough products ("Cookie Dough Products").

### B.      Nestlé Purchases the Sifter from Great Western

8.      Around April 3, 2012, Great Western provided the Danville Factory a proposal quote that invited Nestlé to make an offer for Great Western's model QA46-7, in-line stainless steel pressure flour sifter.  In a purchase order dated June 26, 2012, which Nestlé sent to Great Western, Nestlé offered to buy one model QA46-7, in-line stainless steel pressure flour sifter from Great Western for $88,780.00, with delivery for $1,332.29 (the "Purchase Order").

9.      The Purchase Order "is subject to all printed and written terms and conditions" attached to the Purchase Order, which include the following merger/integration, warranty, indemnification, attorney fees, and offer acceptance provisions:

HB: 4829-4731-5690.1

a.   Merger/Integration

- "The agreement ('Agreement') between the Nestlé entity ('Buyer') and Seller [Great Western] . . . is comprised of the following documents: (i) these Terms and Conditions of Purchase of Equipment, Machinery, Apparatus and/or Materials ('Terms and Conditions of Purchase'); (ii) the Purchase Order issued by Buyer ('Purchase Order') and the terms and conditions stated on the face of the Purchase Order; (iii) Buyer's Equipment Specifications referenced on the face of the Purchase Order ('Buyer's Specification'); (iv) if applicable, the Supplemental Terms and Conditions for Installation of Equipment; and (v) any other supplemental documents referenced on the face of the Purchase Order, or referenced in Buyer's Specifications."

- "The Agreement expressly limits acceptance to the terms and conditions stated in the Agreement, and any additional or different terms or conditions proposed by Seller are hereby rejected, unless expressly agreed to in writing by an authorized representative of Buyer, and which specifically states that such writing constitutes an amendment to the Agreement."

- "Any reference to Seller's quotation or proposal in the Agreement will not be deemed to incorporate any terms or conditions in Seller's quotation or proposal which conflict with or are inconsistent with any terms and conditions in the Agreement, and all such conflicting or inconsistent terms or conditions in Seller's quotation or proposal are hereby excluded and not deemed a part of the Agreement."

- "The written documents comprising the Agreement (as described in Section 1 of these Terms and Conditions of Purchase), and anything attached to or incorporated into it, constitutes the final, complete, and entire agreement between the parties."

- "Any Seller quotations, proposals, contracts, invoices, purchase orders, confirmation orders, work orders, or similar documents, regardless of when dated, are hereby rejected and will not modify the Agreement."

b.   Warranty

- "Seller will deliver the items of equipment, machinery, apparatus or materials described on the face of the Purchase Order (individually, and collectively, the 'Equipment'), and will

provide any installation or related services specified on the face of the Purchase Order, all in accordance with the terms and conditions of the Agreement . . . ."

- "Seller represents and warrants to Buyer, and Seller agrees that: . . . (iii) the Equipment will conform to all descriptions, standards, and specifications in the Agreement, including but not limited to, Buyer's Specifications[ ]; (iv) Seller has reviewed Buyer's Specifications and has determined that the Equipment is capable of complying with Buyer's Specifications[; and] (v) the Equipment will be free from defects in design, materials and workmanship, and will be of the quality specified . . . ."

- "If any party breaches the Agreement, the non-breaching party has the right to assert all available legal and equitable remedies."

c.  Indemnification

"Seller will defend, indemnify and hold harmless Buyer, its parents, subsidiaries, affiliates, and their respective officers, agents, and employees from and against any and all claims, demands, losses, liabilities, fines, penalties, damages, actions, and expenses (including, but not limited to, reasonable attorneys' fees and costs of suit) arising out of or resulting from: (i) any act or omission of Seller, its employees, agents, subcontractors, or anyone directly or indirectly employed or retained by Seller in the performance of the Agreement; (ii) any claim or alleged claim that the Equipment, or Buyer's use thereof, violates the rights of any third party; or (iii) Seller's breach of any representation, warranty, obligation, or covenant in the Agreement."

d.  Attorney Fees

"In the event any legal action, suit or proceeding is brought by either party by reason of any default or breach of the Agreement by the other party, or to enforce a party's rights under the Agreement, the prevailing party will be entitled to all of its costs and expenses of suit, including reasonable attorneys' fees and court costs."

e.  Offer Acceptance

"Seller accepts and will be bound by the terms and conditions of the Agreement when Seller: (i) commences performance of the Agreement; or (ii) accepts any payment from Buyer pursuant to the Agreement, whichever occurs earlier."

4

10.     Great Western accepted Nestlé's offer by sending a confirming invoice, dated September 10, 2012; shipping to the Danville Factory a model QA46-7, in-line stainless steel pressure flour sifter; or accepting payment from Nestlé for the sifter.  Great Western's invoice does not contain terms and conditions or provisions that contradict the terms and conditions of the Purchase Order.

11.     Around September 7, 2012, Great Western shipped from Leavenworth, Kansas to the Danville Factory a model QA46-7, in-line stainless steel pressure flour sifter ("Great Western Sifter").  Nestlé received and accepted the shipment of the sifter.

12.     Great Western markets the QA46-7 sifter as a quality assurance tool for removing impurities from products.  A purpose of the sifter is to remove foreign material from flour.  Within the sifter, sifting screens rotate while the flour flows from the top to the bottom of the sifter, thereby sifting out foreign material.  Flour enters the sifter through an inlet hose and exits the sifter through an outlet hose.  Material that has been sifted from the flour exits the sifter through a separate tailings hose.

13.     For the inlet, outlet, and tailings hoses, the manual for the Great Western sifter recommends 610w model hoses manufactured by Gates Corporation ("Gates").  Gates 610w hose is a food and beverage hose for pneumatic transfer of flour and other dry foods.  The inner layer (tube) of the hose contains natural rubber that is white in color.

**C.     Great Western Installs the Sifter at the Danville Factory**

14.     Around September 17, 2012, Nestlé and Great Western entered into a service agreement under which Great Western supplied a technician to assist with the installation and commissioning of the Great Western Sifter at the Danville Factory ("Service Agreement").  The Service Agreement, among other terms, provides:

HB: 4829-4731-5690.1

- "Company [Great Western] accepts and will be bound by the terms hereof the earlier of either when it commences performance hereunder or accepts any payment from Nestlé on this Service Agreement. This Service Agreement expressly limits acceptance to the terms stated herein . . . ."

- "Company expressly warrants (i) that all materials (if any) incorporated into its work hereunder will be new unless otherwise specified, and will be suitable and approved for use in a food production and storage facility in accordance with all applicable laws, rules and regulations; and (ii) that all Services will be of good quality, free from faults and defects and in conformance with any and all specifications, guidelines or requirements set forth or referenced in this Service Agreement. All warranties implied by law are incorporated herein."

- "Company shall, at Nestlé's option, either promptly repair or reimburse Nestlé for its cost to repair all damage or loss to real or personal property sustained by Nestle, its agents, servants or employees which are caused in whole or in part by Company, or anyone directly or indirectly employed by Company."

- "Company shall defend, indemnify and hold harmless Nestle, its affiliates, and their officers, agents and employees ('Indemnities') from and against all claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees arising out of or resulting from (i) any injury, sickness, disease or death to person; (ii) damage or destruction to real or personal property, including the loss of use resulting there from; or (iii) any breach by Company of this Service Agreement resulting in any damage to Indemnities or to others for whom indemnities may be liable, caused in whole or in part by any act or omission of the Company, or anyone directly or indirectly employed by Company . . . ."

- "In the event any action or suit is brought by Nestlé by reason of any default or breach of this contract by Company, then Nestlé shall be entitled to recover from Company all of its costs and expenses of suit, including reasonable attorneys fees and costs."

15.     Pursuant to the Service Agreement, Great Western installed the sifter at the Danville Factory. Great Western included Gates 610w model hoses for the inlet, outlet, and tailings hoses. Nestlé used the Great Western Sifter as the post-silo flour sifter in the Danville Factory to make Cookie Dough Products.

HB: 4829-4731-5690.1

**D.**     **Nestlé Issues a Recall After Consumers Find Rubber in Cookie Dough Products**

16.     On September 30, 2019, Nestlé began receiving complaints from consumers who reported finding pieces of rubber approximately 1.5 millimeters thick in Cookie Dough Products. From September 30 to October 24, 2019, Nestlé received seven complaints of rubber in several Cookie Dough Products, all of which Nestlé had manufactured at the Danville Factory.

17.     Nestlé identified the outlet hose in the Great Western Sifter, which was a Gates 5" 610w hose, as the source of the rubber contamination in the Cookie Dough Products. In order to ensure consumer safety, on October 31, 2019, Nestlé issued a voluntary nationwide recall comprising 107 batches of 26 different Cookie Dough Products that Nestlé had manufactured at the Danville Factory (the "Recall"). The Recall encompassed approximately 2.25 million cases of Cookie Dough Products.

18.     Numerous local and national news outlets reported on the Recall. Tens of thousands of people visited Nestlé's recall landing page, and there were hundreds of thousands of social media interactions about the Recall.

19.     Nestlé incurred substantial damages as a direct result of the failure of the Great Western Sifter and its outlet hose component. Nestlé, among other actions, had to destroy unusable inventory, refund and credit customers for unusable inventory it had sold, and incur additional expenses to produce Cookie Dough Products to restore its inventory and replenish store shelves. Nestlé also incurred other damages and lost profits. In this action, Nestlé seeks to recover from Great Western the damages resulting from the failure of the Great Western Sifter.

HB: 4829-4731-5690.1

### E.    The Great Western Sifter Was Defective and Unreasonably Dangerous

20.    The outlet hose within the Great Western Sifter was the source of the rubber contamination.  Pieces of rubber found by consumers in Cookie Dough Products matched the rubber inner layer of the hose.

21.    Rubber ended up in Cookie Dough Products because the hose had delaminated, meaning pieces of the inner rubber layer from the hose tubing had peeled off and contaminated the flour, and the final products.  The hose delaminated as a result of a defect in the Great Western Sifter, which existed at the time of Great Western's sale of the sifter, at the time of the shipment of the sifter, when the sifter left Great Western's control, and at all other relevant times.

22.    The defect is unreasonably dangerous and unfit for use in manufacturing food products.  Delamination is not a normal or common failure mode for hoses within a sifter such as the Great Western Sifter.  X-rays and magnets in manufacturing production lines likely cannot detect rubber pieces, and those pieces can be a hazard to consumers, particularly when, as occurred here, the rubber pieces are similar in color to the food products.  In addition, because the hose that delaminated was the outlet hose in the Great Western Sifter, it was downstream from the sifting mechanism, thus resulting in rubber contamination that could not be removed by the sifter.

23.    For these and other reasons, the Great Western Sifter is incompatible with government standards, industry standards, or reasonable consumer expectations.  The sifter and Great Western's installation and commissioning of the sifter did not conform to Great Western's specifications or the warranties and other terms and conditions of the contracts between Nestlé and Great Western.  Nestlé did not know of the defect and could not have reasonably expected the sifter to have the defect.  Nor could Nestlé have discovered the defect through a reasonable inspection.

HB: 4829-4731-5690.1

24.     Great Western did not warn Nestlé of the potential for delamination failure, even though Great Western knew, or at a minimum should have known, of the potential for delamination and could have reasonably anticipated injury, harm, or damages would result from delamination. Great Western had no reason to believe that Nestlé knew the Great Western Sifter was defective or dangerous.  Nestlé did not know the sifter was defective or dangerous before the events leading up to the Recall, and the dangerous condition was not obvious or readily discoverable.  The failure of Great Western to adequately apprise Nestlé of the defect or danger deprived Nestlé of necessary information that could have prevented its damages and the Recall had Nestlé known.

**F.      Nestlé Notifies Great Western of Its Breaches and Nestlé's Losses**

25.     On January 9, 2020, Nestlé notified Great Western by letter that Nestlé had issued the Recall because several consumers reported finding rubber pieces in their Cookie Dough Products, and Nestlé had matched several of those rubber pieces to the outlet hose within the Great Western Sifter.  The letter also explained Nestlé had incurred significant losses resulting from the Great Western Sifter and its hose component, and Great Western is responsible for those losses. As of the date of the filing of this complaint, Great Western has not paid Nestlé any portion of its damages, nor has Great Western agreed to indemnify Nestlé.

## FIRST CLAIM FOR RELIEF

(Negligence)

26.     Nestlé alleges paragraphs 1 through 25 as though set forth herein.

27.     Great Western designed, manufactured, and marketed the Great Western Sifter, sold and shipped the sifter to Nestlé, and installed and commissioned the sifter.

HB: 4829-4731-5690.1

28.     At the time of sale, shipment, and installation, when the Great Western Sifter left Great Western's control, and at all other relevant times, the sifter was unreasonably dangerous for the use to which it would ordinarily be put or some other reasonably foreseeable purpose:

      a.   Delamination is not a normal or common failure mode for components within an industrial flour sifter such as the Great Western Sifter.

      b.   Rubber pieces can be a hazard for consumers, particularly when those pieces are approximately 1.5 millimeters thick and similar in color to food products.

      c.   Because the hose that delaminated was the outlet hose in the Great Western Sifter, it was downstream from the sifting mechanism, thus resulting in rubber contamination that could not be removed by the sifter.

      d.   Great Western did not adequately inform or warn Nestlé of the potential for delamination failure, or that the Great Western Sifter was defective or dangerous.

      e.   The Great Western Sifter is incompatible with government standards, industry standards, or reasonable consumer expectations.

29.     Great Western had a duty to exercise reasonable care in the design, research, manufacture, marketing, supply, promotion, packaging, sale, distribution, warnings, instructions, shipment, installation, and commissioning of the Great Western Sifter.

30.     Great Western breached its duty by failing to exercise reasonable care in the design, research, manufacture, marketing, supply, promotion, packaging, sale, distribution, warnings, instructions, shipment, installation, and commissioning of the Great Western Sifter.  Great Western knew or should have known the Great Western Sifter was unreasonably dangerous for the use to which it would ordinarily be put or some other reasonably foreseeable purpose.

HB: 4829-4731-5690.1

31.     At all relevant times, Nestlé used the Great Western Sifter for the use to which it would ordinarily be put or another reasonably foreseeable purpose.

32.     Nestlé could not have reasonably discovered the Great Western Sifter was defective or perceived its danger.

33.     The defective condition of the Great Western Sifter caused Nestlé's harm and damages.

## SECOND CLAIM FOR RELIEF

(Strict Products Liability – Manufacturing Defect)

34.     Nestlé alleges paragraphs 1 through 33 as though set forth herein.

35.     Great Western designed, manufactured, and marketed the Great Western Sifter, sold and shipped the sifter to Nestlé, and installed and commissioned the sifter.

36.     At the time of sale, shipment, and installation, when the Great Western Sifter left Great Western's control, and at all other relevant times, the sifter had a manufacturing defect that rendered the sifter unreasonably dangerous for the use to which it would ordinarily be put or some other reasonably foreseeable purpose, for the reasons set forth above in paragraph 28.

37.     Nestlé could not have reasonably discovered the Great Western Sifter was defective or perceived its danger.

38.     At all relevant times, Nestlé used the Great Western Sifter for the use to which it would ordinarily be put or another reasonably foreseeable purpose.

39.     The defective condition of the Great Western Sifter caused Nestlé's harm and damages.

HB: 4829-4731-5690.1

## THIRD CLAIM FOR RELIEF

(Strict Products Liability – Design Defect)

40. Nestlé alleges paragraphs 1 through 39 as though set forth herein.

41. Great Western designed, manufactured, and marketed the Great Western Sifter, sold and shipped the sifter to Nestlé, and installed and commissioned the sifter.

42. At the time of sale, shipment, and installation, when the Great Western Sifter left Great Western's control, and at all other relevant times, the sifter had a design defect that rendered the sifter unreasonably dangerous for the use to which it would ordinarily be put or some other reasonably foreseeable purpose, for the reasons set forth above in paragraph 28.

43. Nestlé could not have reasonably discovered the Great Western Sifter was defective or perceived its danger.

44. At all relevant times, Nestlé used the Great Western Sifter for the use to which it would ordinarily be put or another reasonably foreseeable purpose.

45. The defective condition of the Great Western Sifter caused Nestlé's harm and damages.

## FOURTH CLAIM FOR RELIEF

(Strict Products Liability – Failure to Warn)

46. Nestlé alleges paragraphs 1 through 45 as though set forth herein.

47. Great Western designed, manufactured, and marketed the Great Western Sifter, sold and shipped the sifter to Nestlé, and installed and commissioned the sifter.

48. Great Western knew, or reasonably should have known, the Great Western Sifter was unreasonably dangerous for the use for which it was supplied or any other reasonably foreseeable purpose, for the reasons set forth above in paragraph 28.

HB: 4829-4731-5690.1

49.     The unreasonably dangerous condition of the Great Western Sifter existed at the time of sale, shipment, and installation, when the sifter left Great Western's control, and at all other relevant times.

50.     Great Western had no reason to believe Nestlé would realize the dangerous condition of the Great Western Sifter, the dangerous condition was not obvious or readily discoverable by Nestlé, and Nestlé did not discover or know of the dangerous condition before the events leading up to the Recall.

51.     At all relevant times, Nestlé used the Great Western Sifter for the use to which it would ordinarily be put or another reasonably foreseeable purpose.

52.     Great Western did not inform or warn Nestlé, or otherwise provide adequate or reasonable warnings, of the dangerous characteristics of the Great Western Sifter or of the facts that made it likely to be dangerous.

53.     Great Western's failure to warn caused Nestlé's harm and damages.

**<u>FIFTH CLAIM FOR RELIEF</u>**

(Breach of the Implied Warranty of Merchantability)

54.     Nestlé alleges paragraphs 1 through 53 as though set forth herein.

55.     Great Western is, and at all relevant times was, a merchant that regularly manufactures, markets, and sells industrial sifters, such as the Great Western Sifter.  Nestlé and Great Western entered into a contract for the sale of goods by which Nestlé purchased the sifter from Great Western.  Pursuant to the contract, Great Western sold the sifter to Nestlé and impliedly warranted the sifter would be merchantable.  Great Western did not exclude or modify the implied warranty of merchantability, and Nestlé in fact reserved all of its legal and equitable rights and remedies.

13

56.     Nestlé accepted the shipment of the Great Western Sifter.  At all relevant times, Nestlé used the sifter for the use to which it would ordinarily be put or another reasonably foreseeable purpose.

57.     Great Western breached the implied warranty of merchantability by providing goods that, at the time of sale and shipment, when the goods left Great Western's control, and at all other relevant times, were not merchantable.  The Great Western Sifter was unfit for the ordinary purpose for which it is used and unreasonably dangerous, for the reasons set forth above in paragraph 28.

58.     Nestlé did not discover, and could not have discovered by reasonable inspection, the conditions making the Great Western Sifter not merchantable.

59.     The conditions making the Great Western Sifter not merchantable were the proximate cause of Nestlé's harm and damages.

60.     Nestlé notified Great Western of its breaches and Nestlé's losses.

## SIXTH CLAIM FOR RELIEF

(Breach of the Implied Warranty of Fitness for a Particular Purpose)

61.     Nestlé alleges paragraphs 1 through 60 as though set forth herein.

62.     Great Western is, and at all relevant times was, a merchant that regularly manufactures, markets, and sells industrial sifters, such as the Great Western Sifter.  Nestlé and Great Western entered into a contract for the sale of goods by which Nestlé purchased the sifter from Great Western.  Pursuant to the contract, Great Western sold the sifter to Nestlé.

63.     Nestlé accepted the shipment of the Great Western Sifter.  Nestlé used the sifter as part of a manufacturing line in a factory that manufactured food products for consumers.

64.    At the time of contracting and sale, pursuant to the contract, the parties' course of dealing, Nestlé's business, and the nature of the goods for which they contracted, Great Western had reason to know of the particular purpose for which Nestlé purchased the Great Western Sifter and that Nestlé was relying on Great Western's superior skill or judgment to select or furnish goods appropriate for the particular purpose.  Nestlé in fact relied on Great Western's superior skill or judgment.

65.    Great Western impliedly warranted the Great Western Sifter would be fit for the particular purpose for which Nestlé used the sifter.  Great Western did not exclude or modify the implied warranty of fitness for a particular purpose, and Nestlé in fact reserved all of its legal and equitable rights and remedies.

66.    Great Western breached the implied warranty of fitness for a particular purpose by providing goods that, at the time of sale and shipment, when the goods left Great Western's control, and at all other relevant times, were not fit for the particular purpose for which they were required and intended, for the reasons set forth above in paragraph 28.

67.    Nestlé did not discover, and could not have discovered by reasonable inspection, the conditions making the Great Western Sifter unfit for the particular purpose for which Nestlé used the sifter.

68.    The conditions making the Great Western Sifter unfit for the particular purpose for which Nestlé used the sifter were the proximate cause of Nestlé's harm and damages.

69.    Nestlé notified Great Western of its breaches and Nestlé's losses.

## SEVENTH CLAIM FOR RELIEF

(Express Contractual Indemnity)

70.    Nestlé alleges paragraphs 1 through 69 as though set forth herein.

HB: 4829-4731-5690.1

71.     Nestlé and Great Western entered into a contract for the sale of goods by which Nestlé purchased the Great Western Sifter from Great Western.  Pursuant to the contract, Great Western sold the sifter to Nestlé.

72.     Nestlé and Great Western also entered into a contract for Great Western to assist with the installation and commissioning of the Great Western Sifter.

73.     As part of the basis of the bargain between Nestlé and Great Western, Great Western agreed, as terms and conditions of the contracts, to defend, indemnify, and hold harmless Nestlé from and against (i) any and all claims, demands, losses, liabilities, fines, penalties, damages, actions, and expenses (including attorney fees and costs of suit) arising out of or resulting from Great Western's performance of the Purchase Order, including Great Western's breach of any representation, warranty, obligation, or covenant in the Purchase Order; and (ii) any and all claims, damages, losses,  and expenses (including attorney fees) arising out of or resulting from any injury; damage or destruction to real or personal property, including the loss of use of such property; or any breach by Great Western of the Service Agreement resulting in damage, caused by any act or omission by Great Western or anyone directly or indirectly employed by Great Western ("Indemnification Obligations").

74.     Nestlé performed all of its obligations under the contracts, including by paying Great Western, except to the extent those obligations were waived, prevented, or excused.

75.     As a direct and proximate result of Great Western's performance of, or breach of its obligations or representations and warranties under, the contracts, Nestlé has incurred damages and continues to incur additional losses or liabilities not yet known.

76.     Up to the date of the filing of this complaint, despite Nestlé's demands, Great Western has failed and refused to fulfill its Indemnification Obligations, to which Nestlé is entitled.

16

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Relief)

77.     Nestlé alleges paragraphs 1 through 76 as though set forth herein.

78.     An actual controversy exists between Nestlé and Great Western concerning their respective rights and duties under the contracts into which the parties entered.  Nestlé contends Great Western is required to fulfill the Indemnification Obligations and has breached the contracts. Great Western contends it is not required to fulfill those obligations and has not breached the contracts.

79.     Nestlé desires a judicial determination of its rights and a declaration as to whether Great Western is required to fulfill the Indemnification Obligations for all losses, damages, and expenses, costs, and fees, and other liabilities Nestlé has incurred, and will incur, arising from the Great Western Sifter.

80.     A judicial declaration is necessary and appropriate at this time under the circumstances so Nestlé may ascertain its rights under the contracts between it and Great Western.

## RELIEF REQUESTED

WHEREFORE, Nestlé respectfully prays the Court enter judgment in favor of Nestlé and against Great Western on all counts asserted, as follows:

    a.   Awarding Nestlé its monetary damages, including actual, incidental, special, and consequential damages, in an amount in excess of $75,000.00;

    b.   Awarding Nestlé pre- and post-judgment interest;

    c.   Awarding Nestlé costs of the lawsuit, including reasonable attorney fees;

    d.   Entering a declaration that Great Western must defend, indemnify, and hold harmless Nestlé from and against any and all claims, demands, losses,

17

liabilities, fines, penalties, damages, actions, and expenses (including attorney fees and costs of suit) arising out of or resulting from Great Western's performance of the Purchase Order, including Great Western's breach of any representation, warranty, obligation, or covenant in the Purchase Order;

e.  Entering a declaration that Great Western must defend, indemnify, and hold harmless Nestlé from and against any and all claims, damages, losses,  and expenses (including attorney fees) arising out of or resulting from any injury; damage or destruction to real or personal property, including the loss of use of such property; or any breach by Great Western of the Service Agreement resulting in damage, caused by any act or omission by Great Western or anyone directly or indirectly employed by Great Western; and

f.  Ordering such other and further relief as the Court may deem just and proper.

Dated:  May 17, 2021                    Respectfully submitted,

                                        */s/ Michael S. Hargens*
                                        Michael S. Hargens (KS# 20689)
                                        HUSCH BLACKWELL LLP
                                        4801 Main St., Suite 1000
                                        Kansas City, MO 64112
                                        Telephone:  (816) 983-8000
                                        Facsimile:  (816) 983-8080
                                        E-mail:  michael.hargens@huschblackwell.com

                                        Bryan A. Merryman (*pro hac vice forthcoming*)
                                        Russell J. Gould III (*pro hac vice forthcoming*)
                                        WHITE & CASE LLP
                                        555 South Flower Street, Suite 2700
                                        Los Angeles, CA 90071
                                        Telephone:  (213) 620-7700
                                        Facsimile:  (213) 452-2329
                                        E-mail: bmerryman@whitecase.com
                                        E-mail: russell.gould@whitecase.com

*Attorneys for Plaintiff Nestlé USA, Inc.*

## **REQUEST FOR TRIAL BY JURY**

Plaintiff Nestlé USA, Inc. requests trial by jury in this action.